In re Daniel BOONE and
Sara Boone, Debtors.

COMMUNITY BANK OF HOMESTEAD,
Appellant,

v.

Daniel BOONE and Sara
Boone, Appellees.

Bankruptcy Nos. 93–1152–CIV,
89–13455–BKC–AJC.
Adv. No. 89–0376–BKC–AJC–A.

United States District Court,
S.D. Florida.

Feb. 2, 1994.

Robert M. Hustead, Robert M. Hustead, P.A., Homestead, FL, for appellant Community Bank of Homestead.

Barbara L. Phillips, Phillips and Phillips, P.A., Miami, FL, for appellees Daniel Boone and Sara Boone.

### ORDER AFFIRMING FINAL JUDGMENT OF BANKRUPTCY COURT

ARONOVITZ, District Judge.

This is an appeal by Appellant Community Bank of Homestead (the "Bank") from the Final Judgment in Favor of Defendants, Daniel Boone and Sara Boone entered on February 28, 1991 by Judge A. Jay Cristol of the United States Bankruptcy Court for the Southern District of Florida. The Court has considered the briefs on appeal, oral argument of counsel, the record on appeal, the decision of the lower court and the applicable law, and is otherwise fully advised in the premises. For the following reasons, this Court AFFIRMS the decision of the Bankruptcy Court.

### Factual and Procedural Background

The underlying adversary proceeding in bankruptcy was initiated by the Appellees, Daniel and Sara Boone (the "Boones"), against the Bank seeking, among other things, relief from the Bank's alleged interference with the Boones' contract for the sale of their home. The pertinent facts giving rise to the interference claim are as follow.

In November of 1985, the Bank made a loan to the Boones in the amount of $59,000, secured by a mortgage on the Boones' residence in Homestead, Florida. In August of 1988, the Bank made a $45,000 commercial loan to Daniel Boone Farms, Inc., a corporation wholly owned by the Boones. The Boones executed an unsecured Guaranty in connection with this commercial loan. On or about June 30, 1989, the Boones defaulted on the commercial loan and shortly thereafter, on July 11, 1989, filed for relief under Chap-

ter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida.

On June 27, 1989, prior to filing the bankruptcy petition, the Boones entered into a sales purchase agreement with Douglas and Alice Ulmer (the "Ulmers") for the sale of their home for the amount of $91,000. Closing was scheduled for July 31, 1989. On July 25, the Bank's senior vice president sent the closing agent an "estoppel letter," which stated that the balance due on the home mortgage loan was $50,284.88. Two days later on July 27, the Bank sent a revised letter, this time stating that the outstanding balance was $97,664.46, the sum of $50,315.42 (balance due on the home mortgage loan, and $47,-349.04 (balance due on the commercial loan under the Guaranty). The Bank claims that the increased amount due demanded in the second letter was based on the "dragnet" clauses contained in the mortgage agreement, which provided that the Boones would pay "any and all other loans and advancements" which may be made by the Bank, and that "the lien of this deed secures and shall continue to secure payment of said indebtedness or indebtednesses, however evidenced . . . "

The Boones first became aware of the second estoppel letter at the closing on July 31, which Robert M. Hustead, the Bank's counsel, attended. Since the amount demanded in the Bank's second letter exceeded the sale price of their home and would have left no proceeds from the sale, the Boones did not consummate the transaction.

In August of 1989, the Boones filed an adversary complaint in the lower court, seeking, *inter alia,* to determine the validity, priority or extent of the Bank's lien. They also claimed that the Bank intentionally interfered with their sales contract with the Ulmers. The Bank filed a counterclaim, seeking to have the Boones' Guaranty declared nondischargeable.

The trial was bifurcated as to liability and damages. Liability issues were tried before the lower court on December 14, 1989, resulting in a Final Judgment in favor of the Boones. The lower court ruled that the commercial loan was not collateralized by the Boones' homestead, and that the "dragnet" clauses in the mortgage did not convert the unsecured Guaranty to a secured one. The court also found that the Bank had interfered with the sale of the home to the Ulmers.

A second trial was held on January 9, 1991 on the issue of damages resulting from the Bank's interference with contract. The lower court determined damages to be $10,-198.66 and then awarded treble compensatory damages for a punitive award of $30,-595.98. Final judgment on the damages issue was entered on February 28, 1991. A third trial was conducted on the Bank's counterclaim, resulting in the discharge of the Boones' Guaranty on March 22, 1993.

The Bank then sought to alter or amend the February 28, 1991 Final Judgment, claiming that the tort claim underlying the damages award is not a core or "related" matter, and that it is entitled to offset against the $30,595.98 judgment against it, its claim against the Boones for approximately $45,000 (the debt under the Guaranty). The Bank's motion was denied on April 9, 1993 and this appeal followed.

### Discussion

■ The Bank raises the following issues on appeal: (1) whether the Bankruptcy Court had "core" or "related" jurisdiction to determine the interference with contract claim; (2) whether the evidence supports a finding of interference with contract by the Bank; (3) whether the economic loss rule and/or independent tort rule precludes the award of punitive damages; (4) whether the evidence supports the award of punitive damages; and (5) whether the Bankruptcy Court erred in refusing to offset the judgment against the Bank with the Guaranty debt.[1]

---

1. The Court acknowledges that the Bank's Statement of Issues to Be Presented contains fourteen (14) issues on appeal. To the extent that some of these fourteen issues were not raised and argued in the Bank's appellate briefs or during oral argument, those issues are deemed abandoned and waived. *See Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1573, n. 6 (11th Cir.1989) (although a party refers to a particular issue in its Statement of the Case in its initial brief, it proffered no arguments on the merits of that issue and accordingly, said issue is deemed

■ The Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 158(a). In accordance with Federal Rule of Bankruptcy Procedure 8013, the Bankruptcy Court's findings of fact will not be set aside unless clearly erroneous. *In re Chase & Sanborn Corp.*, 904 F.2d 588 (11th Cir.1990); *In re T & B General Contracting, Inc.*, 833 F.2d 1455 (11th Cir.1987). Equitable determinations by the Bankruptcy Court are subject to review under an abuse of discretion standard. *In re Red Carpet Corp. of Panama City Beach*, 902 F.2d 883 (11th Cir.1990). Conclusions of law are subject to *de novo* review. *In re Chase & Sanborn Corp.*, 904 F.2d at 593; *In re Sublett*, 895 F.2d 1381 (11th Cir. 1990). The Court will address the issues on appeal in accordance with these standards of review.

## A. JURISDICTION OF THE BANK-RUPTCY COURT

The first issue on appeal relates to the jurisdiction of the Bankruptcy Court. The Bank contends that there was no basis for the Bankruptcy Court's jurisdiction over the interference with contract claim because that claim was not a "core" or "related" matter. There is no "core" jurisdiction, the Bank argues, because a suit for intentional interference with contract is a "garden variety" tort claim which does not depend on bankruptcy laws for its existence. This Court disagrees.

Core proceedings under 28 U.S.C. § 157(b)(1) are those matters which "aris[e] under title 11" or "aris[e] in a case under title 11." 28 U.S.C. § 157(b)(1) (West 1993). "A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected

by State law." 28 U.S.C. § 157(b)(3) (West 1993). Thus, simply because the Boones' claim is an alleged "garden variety" tort claim under Florida law does not necessarily and automatically render it a non-core matter.

The case of *Matter of O'Sullivan's Fuel Oil Co., Inc.*, 88 B.R. 17 (D.Conn.1988), is instructive on this matter. That case involved an adversary proceeding brought by the Chapter 7 trustee against a bank for, among other things, tortious interference with business that occurred primarily after the bankruptcy petition was filed. The district court rejected the trustee's contention that the tortious interference claim was a non-core matter. It reasoned that at the time the petition was filed, "no meaningful cause of action against [the defendant] for damages yet existed that the debtor could assert." *Id.* at 20. Where no cause of action existed on the date of the filing of the petition, the postpetition proceedings are core proceedings because they arose "in a case under title 11." [2] *Id.*

■ Such is the situation at hand. At the time they filed their petition on July 11, 1989, the Boones had no cause of action against the Bank for interference of contract since all of the Bank's acts of interference with contract occurred postpetition, on July 27, 1989, when it demanded a higher payoff sum in its second estoppel letter, and on July 31, 1989 when it attended the closing. Under these circumstances, the Court finds that the Boones' interference of contract claim is a core matter "arising in a case under title 11." 28 U.S.C. § 157(b)(1).[3] Having found that the matter is a core matter, the Court need

waived); *Tedder v. F.M.C. Corp.*, 590 F.2d 115, 117 (5th Cir.1979) (although point was raised in statement of issues, issue was deemed abandoned where it was not addressed in the brief).

**2.** *See, e.g., In re Arnold Print Works, Inc.*, 815 F.2d 165, 168 (1st Cir.1987) (debtor in possession's action to recover an account receivable arising out of a postpetition contract is a core proceeding because it is a matter "concerning the administration of the estate" under § 157(b)(2)(A)) and a proceeding "affecting the liquidation of the assets of the estate" under § 157(b)(2)(O)); *J.B. Van Sciver Co. v. William*

*Cooper Associates*, 73 B.R. 838, 843–44 (Bankr. E.D.Pa.1987) (debtor in possession's action for breach of postpetition real estate sales contract entered into with court approval is a core proceeding); *Sywilok v. Estee Lauder, Inc.*, 71 B.R. 975, 978–80 (Bankr.D.N.J.1987) (action to collect postpetition account receivable is a core proceeding because it arises in case and was not owned by debtor when case commenced).

**3.** Apparently the court below also believed that it had core jurisdiction since the interference claim arose postpetition. *See* Hearing Transcript on Motion to Dismiss at 12 (October 12, 1989).

not address the Bank's argument that the interference claim is not a "related" matter.

## B. *LIABILITY ON INTERFERENCE OF CONTRACT CLAIM: THE BUSINESS INTEREST PRIVILEGE*

The Bank argues that it had a privilege to interfere with the Boone/Ulmer contract because it was protecting its business interest, and therefore, cannot be liable for interference with contract. The Court finds otherwise.

■ The general rule is that activities taken to safeguard one's own justifiable business or contractual interests are not actionable under Florida law. *See Tietig v. Southeast Regional Construction Corp.*, 557 So.2d 98 (Fla. 3d DCA 1990); *Menendez v. Beech Acceptance Corp.*, 521 So.2d 178 (Fla. 3d DCA 1988); *Ethyl Corp. v. Balter*, 386 So.2d 1220 (Fla. 3d DCA 1980), *cert. denied*, 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981). However, the business interest privilege is not absolute. *See Frank Coulson, Inc. v. General Motors Corp.*, 488 F.2d 202, 207 (5th Cir.1974). It does not encompass the purposeful causing of a breach of contract or situations where the defendant employs improper means to protect his interest.[4] Thus, the business interest privilege can not be a shield against liability where improper means are used to protect one's business interest or where one purposefully causes a breach of contract.

■ The Bank claims that it did not employ improper means to protect its interest because it relied on the so-called "dragnet" clauses in the home mortgage in demanding a higher payoff amount in the second estoppel letter. It relies on *Riedel v. NCNB National Bank of Florida, Inc.*, 591 So.2d 1038 (Fla. 1st DCA 1991). *Riedel*, however, is distinguishable.

First, *Riedel* did not even involve an interference with contract issue but rather, a breach of the duty of good faith and fair dealing claim. Second, the court in *Riedel* clearly found that the defendant bank did not act in bad faith when it retained certain stock as collateral under a "cross-collateralization" clause in the mortgage agreement. In contrast, in this case, the court below clearly determined that the Bank acted in bad faith and with malice. It specifically found that the Bank's interference was "intentional and willfully pursued in wanton disregard" and that the Bank exhibited "actual malice" and "oppressive and cruel behavior." *See* Findings of Fact and Conclusions of Law at p. 6, ¶ 4 and p. 7 (February 28, 1991). Such behavior clearly constitutes "improper means and acts."

Under these circumstances, the lower court did not err in finding the Bank liable for interference with the Boone/Ulmer contract.

## C. *PUNITIVE DAMAGES AWARD*

The Bank lodges a two-prong challenge to the punitive damages award against it. It claims that (1) the award of punitive damages is precluded by the economic loss rule and/or the independent tort rule; and (2) the award of punitive damages is improper where conduct is taken in reliance on the advice of counsel. The Boones claim otherwise.

■ The economic loss rule prohibits tort recovery between parties to a contract when a party suffers economic loss but no personal injury or property damage. *See Casa Clara Condominium Association, Inc. v. Charley Toppino and Sons, Inc.*, 620 So.2d 1244 (Fla.1993) and cases cited therein. This Court seriously questions whether the economic loss rule applies to torts that are structured to protect purely economic interests, such as intentional or tortious interference claims.[5] The Court is not persuaded

4. *See Yoder v. Shell Oil Co.*, 405 So.2d 743, 744 (Fla. 2d DCA 1981) ("a privilege to interfere with a third party's conduct does not include the purposeful causing of a breach of contract"); *Ethyl Corp.*, 386 So.2d at 1225 ("*so long as* improper means are not employed," conduct taken to safeguard one's financial interests are non-

actionable); 32 Fla.Jur.2d, *Interference*, § 3 at 99 (1981) (defendant may not "employ improper means and acts to protect his interest").

5. *See Waldinger Corp. v. CRS Group Engineers, Inc.*, 775 F.2d 781 (7th Cir.1985) (because the interest protected by the tort of intentional inter-

that the economic loss rule applies to the facts of this case.

■ The Bank's argument under the independent tort rule also must fail. To obtain tort recovery, there must be a tort "distinguishable from or independent of [the] breach of contract." *AFM Corp. v. Southern Bell Telephone and Telegraph Co.*, 515 So.2d 180, 181 (Fla.1987) (citing *Lewis v. Guthartz*, 428 So.2d 222, 224 (Fla.1982)). There exists such an independent tort here. Under Florida law, the intentional and unjustifiable interference with contractual relations is actionable as a tort. *See* 32 Fla.Jur.2d, *Interference*, § 2 (1981). Moreover, it is clear that the Bank's interference with the Boone/Ulmer contract, a tort, is distinguishable from and independent of its contract with the Boones.

Most importantly, based upon a review of the evidence in the record, this Court finds that the lower court's award of punitive damages was not clearly erroneous. The court below made the following relevant findings of fact:

> In addressing this issue [punitive damages], the Court has heard the testimony of counsel for the BOONES, Barbara L. Phillips, and counsel for the BANK, Robert M. Hustead. Ms. Phillips has testified that there was an agreement on behalf of the BOONES, with Mr. Hustead, on behalf of the BANK, whereby the debt due to the BANK on the commercial loan guaranteed by the BOONES would be satisfied by the BOONES through a new obligation to be entered into by the parties following the sale of the collateral under the commercial loan, and that the BOONES would be able to close on the sale of their home on July 31, 1989. In accordance with this understanding, the BANK issued an estoppel letter on July 25, 1989 indicating that the outstanding balance due to the BANK to satisfy the home mortgage was $50,284.88. Notwithstanding the issuance of the July 25, 1989 estoppel letter, and agreement, on July 27, 1989, the BANK issued a second

> estoppel letter seeking to satisfy the commercial loan in addition to the home mortgage, resulting in the inflated balance of $97,664.46. Mr. Hustead admitted at the trial that he attended the closing on July 31, 1989 to enforce the BANK's request for full payment of the commercial loan through the sale of the BOONES' home. The deposition testimony of the BANK's senior vice-president, John P. Brown, Jr. indicates that Mr. Brown issued the second estoppel letter based upon the advice of Mr. Hustead and that Mr. Brown knew Mr. Hustead would attend the closing.

> By issuing the second estoppel letter and as a result of Mr. Hustead's conduct in attending the July 31, 1989 closing, the Court finds that Mr. Hustead willfully pursued a course of conduct in wanton disregard of the potential harm to the BOONES likely to result as a consequence of the interference with the sale of the BOONES' home. As a result, the Court finds that the BOONES are entitled to recover punitive damages subject to any valid defenses raised by the BANK in this adversary proceeding.

*See* Findings of Fact and Conclusions of Law, at 3–4 (February 28, 1991). Based upon these and other findings of fact contained in the February 28, 1991 Findings of Fact and Conclusions of Law, the lower court made the following conclusions of law:

> In this case, counsel acted for the BANK. He was the BANK. He knew these poor unfortunates, had their worldly goods packed on a truck, ready to drive to a fresh start and a new life in Georgia. They were not sneaking away in the night. They had tried to arrange with the BANK for payment of their commercial debt. There was some collateral which the BANK could have sold and they offered to pay over $15,000 of their homestead money from the closing which might have paid the commercial debt in full. They had further offered to pay any balance without a determination of non-dischargeability. Mr. and

ference with contract is the reasonable expectation of economic advantage, economic losses are recoverable); *GNB, Inc. v. United Danco Batteries, Inc.*, 627 So.2d 492, 499 n. 9 (Fla. 2d DCA 1993) (Supreme Court of Florida did not intend to expand the economic loss rule to intentional torts).

Mrs. BOONE have amply demonstrated their good faith in these dealings. Tragically, it is the only good faith to be found in this case. With debtors packed in their truck and their homestead roof about to be sold, the BANK "generously" offered to take *all* the cash from the closing and leave the family in their truck. The court takes judicial notice that most rental trucks can not make it to Georgia on one tank of gas and that children and even their parents like to have a meal on a ten hour trip.

The conduct of the BANK demonstrates sufficient actual malice or oppression to warrant punitive damages.

*See* Findings of Fact and Conclusions of Law at 6–7 (February 28, 1991).

■ Under Florida law, an award of punitive damages is proper when a defendant's conduct is characterized by "willfulness, wantonness, maliciousness, gross negligence or recklessness, oppression, outrageous conduct, deliberate violence, moral turpitude, insult, or fraud." *Palm Beach Atlantic College, Inc. v. First United Fund, Ltd.*, 928 F.2d 1538, 1546 (11th Cir.1991) (quoting *Cook v. Deltona Corp.*, 753 F.2d 1552, 1563 (11th Cir.1985)). In *Palm Beach,* the corporate defendant, relying on a second bill of sale, attempted to purchase a yacht from the plaintiff-seller at less than the agreed upon value after the closing had occurred. The United States Court of Appeal for the Eleventh Circuit found that such conduct was sufficiently outrageous to warrant the award of punitive damages. *Palm Beach,* 928 F.2d at 1546.

■ The Bank's conduct in this case is of the same type as that of the *Palm Beach* defendant. The lower court correctly found that through the second estoppel letter and the presence of Mr. Hustead at the closing, the Bank was attempting to extract a higher payoff amount than previously agreed by the parties. The circumstances in which the Bank's conduct occurred renders such conduct particularly outrageous, oppressive or malicious. The evidence established that the Bank's actions occurred on the eve of closing, after reaching what the Boones justifiably believed was a settlement or agreement regarding the commercial loan. The evidence showed that the Boones arrived at closing fully believing that they had settled their dispute with the Bank and fully expecting to close on the sale of their home to the Ulmers. With their children waiting outside and their truck packed with their remaining belongings and personal property, the Boones were ready to depart immediately thereafter to Georgia to begin a new life among relatives. The evidence further established that the Bank intentionally reneged on its agreement to permit the closing to proceed pursuant to previously agreed to terms in wanton disregard of the potential harm to the Boones.

Under these circumstances, the clear effect of the Bank's unexpected eleventh hour claim under the so-called "dragnet clauses" of the mortgage agreement left the Boones high and dry, unable to close on the deal because no monies would be received from the sale of their home and thus, unable to carry out their intention to move to Georgia free of their obligations in Florida.

It is this conduct of the Bank, through the conduct of Mr. Hustead,[6] taken in the context of the events and expectations that had transpired, that the Bankruptcy Court found to be malicious, oppressive and taken with reckless disregard of the rights and interests of the Boones to proceed with plans previously known and anticipated by the Bank. It is evident from the record that the circumstances in which the Bank's conduct arose weighed very heavily in the lower court's findings of fact and in its decision to award punitive damages. After a careful review of the record, the Court finds that the lower court's ruling is amply supported by the evidence and is not clearly erroneous.

### D. *SET–OFF*

■ The final issue is whether the lower court correctly ruled that the Bank cannot set off the judgment against it with the

---

6. The lower court correctly rejected the advice of counsel defense. There is sufficient evidence to support the lower court's specific finding that the Bank's counsel, Mr. Hustead, was the Bank. *See* Findings of Fact and Conclusions of Law at 6 (February 28, 1991).

Boones' Guaranty debt under 11 U.S.C. § 553(a). After a review of the applicable law, the Court finds no error with the lower court's ruling.

Under section 553(a), a creditor has the right to offset a mutual debt owing by such creditor to the debtor so long as both debts arose before the commencement of the bankruptcy action and are otherwise valid and enforceable. *See* 11 U.S.C. § 553(a) (West 1993); *In re Davidovich*, 901 F.2d 1533, 1537 (10th Cir.1990); 4 *Collier on Bankruptcy*, ¶ 553.04[2] (15th ed. 1990). The Bank fails to satisfy these requirements.

First, the requirement that *both* debts arise before the bankruptcy case is not met. Although the Bank's claim on the Guaranty debt arose before the commencement of the bankruptcy action, the Boones' interference with contract claim arose *after* the bankruptcy case. Second, the mutuality requirement is lacking. Such requirement mandates that the debts involved be between the same parties standing in the same capacity. *See In re Davidovich*, 901 F.2d at 1537, and cases cited therein; 4 *Collier on Bankruptcy*, ¶ 553.04[2], *supra.* Claims arising after the commencement of the case lack the requisite mutuality for setoff against prepetition obligations because the postpetition trustee or debtor in possession is considered a different entity from the prepetition debtor. 4 *Collier on Bankruptcy*, ¶ 553.08[1], *supra.* Therefore, the Bank does not have a valid set-off claim.

### Conclusion

In consideration of the above, the Court hereby AFFIRMS the Final Judgment in Favor of Defendants, Daniel Boone and Sara Boone entered by the Bankruptcy Court on February 28, 1991.

DONE AND ORDERED.