944 So.2d 527 (2006)
Paul RHODES, Appellant,
v.
BLP ASSOCIATES, INC., a Florida corporation, Gilbert Goldstein, Howard Gittis and Judgment Acquisition Corporation, Appellees.
No. 4D05-3833.
District Court of Appeal of Florida, Fourth District.
December 20, 2006.
*528 Gerald F. Richman, Jill Weiss and Stefanie R. Shelley of Richman Greer Weil Brumbaugh Mirabito & Christensen, P.A., West Palm Beach, for appellant.
Richard Epstein, Victor Klein and Rebecca Bratter of Greenspoon Marder, P.A., Fort Lauderdale for Appellees-BLP Associates, Inc., Gilbert Goldstein and Howard Gittis, for appellee.
LEWIS, TERRY P., Associate Judge.
In 1988, the appellant Rhodes, along with BLP Associates, Inc., whose principals were appellees Goldstein and Gittis, formed a general partnership called Broward Land Partners, for the purpose of buying and selling certain real estate. The partnership was memorialized in a written agreement and appellant Rhodes was named the managing partner.
In 1994, Rhodes filed a complaint against the other partners for breach of contract, breach of fiduciary duty, accounting, and declaratory relief. BLP filed a counterclaim against Rhodes for accounting, breach of fiduciary duty, and for dissolution of the partnership with appointment of a receiver. The court issued its final judgment on May 13, 1996, dissolving the partnership and appointing a receiver. That final judgment was appealed and affirmed.
Several years later, on February 14, 2005, the trial court conducted a hearing to consider the receiver's final accounting. The final order, dated August 23, 2005, resolved all remaining issues between the parties and determined the proper distribution of partnership funds. The appellant contends the trial court erred in this final order in three respects: (1) determining that certain monies given to the partnership by the partners were capital contributions rather than loans; (2) enjoining *529 distribution of partnership funds to appellant in order to enforce a promissory note from appellant to appellees; and (3) miscalculating the accrued interest on the amount of expenses appellant owed the partnership. We agree with appellant as to the second and third issues, but not as to the first.

CLASSIFICATION OF ADDITIONAL CONTRIBUTIONS TO PARTNERSHIP
Article II of the partnership agreement sets forth the requirements for capitalization of the partnership and the allocation of profit and loss. The agreement contemplated two classes of capital contributions. Class A contributions were nominal amounts paid upon the execution of the agreement showing the percentage share of the partners. Class B contributions were to be made in two installments and totaled $600,000. The other partners agreed to loan Appellant Rhodes his share of the Class B contributions and that loan was evidenced by a separate promissory note. The note provided that it would mature on the date that the Class B capital contributions were "paid in full." Accrued interest on the note was to be paid at any time Rhodes received any distributions of interest on his Class B contribution.
In addition to the capital contributions as noted above, the agreement provided, in Section 2.14(d) as follows:
(d) Additional Capital Contributions and Partner Loans. In the event additional funds in excess of the contributions required to be made in Sections 2.1(a) and (b) hereof and in excess of the Bank Loan described in Section 2.1(c) hereof, are needed to carry out the purposes of the Partnership, then such additional sums necessary therefore may be (but shall not be required to be) advanced as loans from the Partners ("Partner Loan").
This subsection further provided that to the extent a partner made a loan to the partnership, that partner was also to make a Class A capital contribution of $1 for each $600 of funds loaned to the partnership. Section 2.4 of the agreement also established a hierarchy for distribution that placed the payment of interest and principal for partner loans ahead of any payment of the interest and principal for Class B capital contributions.
After the partnership commenced and the initial capital contributions were made, Rhodes sent approximately fifteen requests for additional cash from the partners. Despite the language in Section 2.1(d) which contemplated that such additional monies would be in the form of partner loans, the letters which Rhodes sent out called the requests "capital calls" or otherwise referred to the requested cash infusions as "capital contributions." Likewise, numerous letters from the principals of BLP, responding to these requests for cash, referred to the money they were sending in as "capital contributions." The partnership tax returns in each of those years also classified the contributions as "capital." None of the partners, at the time, characterized any of these contributions as "partner loans", nor did anyone object to Rhodes's use of the terms "capital call" or "capital contributions." In fact, at the final hearing on February 14, 2005, one of BLP's principals, Gilbert Goldstein, testified that he and Rhodes had agreed to treat all additional cash contributions into the partnership as capital rather than partner loans. Rhodes attempted to adjust the Class A contributions based on the response to the capital calls, but Goldstein wrote a letter objecting to it very strenuously.
*530 A written agreement may be modified by the subsequent conduct or course of dealing of the parties. See St. Joe Corp. v. McIver, 875 So.2d 375, 382 (Fla.2004); Gallagher v. Dupont, 918 So.2d 342, 347 (Fla. 5th DCA 2005); White v. Ocean Bay Marina, Inc., 778 So.2d 412 (Fla. 3rd DCA 2001); Franklin Life Ins. Co. v. Davy, 753 So.2d 581, 586 (Fla. 1st DCA 1999); Beach Higher Power Corp. v. Granados, 717 So.2d 563, 565 (Fla. 3rd DCA 1998). Of course, no such modification can occur unless it is by mutual consent, and supported by consideration. St. Joe, 875 So.2d at 382. Here, the record supports such a finding of mutual consent and consideration. The parties referred to the cash infusions as capital contributions, never as loans. The partnership tax returns designated them as capital and there was testimony that this was the intent. The consideration can be found in the fact of the cash infusions themselves, which the partners were not required to make under the agreement.
The appellant maintains that because the language of the agreement in Section 2.14(d) is clear and unambiguous, and contemplates that additional contributions will be in the form of loans, the agreement can not be altered or modified by way of subsequent conduct of the parties. The appellant relies on the case of Cox v. CSX Intermodal, Inc., 732 So.2d 1092 (Fla. 1st DCA 1999) for this proposition. Cox dealt with contracts to haul freight, and specifically, with a clause in the contracts that disclaimed any obligation on the part of the company to provide any specific quantity of freight or number of loads to the truckers. The issue was whether the subsequent course of conduct between the parties established a policy of "first come, first served" to determine orders, and thus modified the contracts.
The First District Court of Appeal acknowledged the general principle that written contracts can be modified by the subsequent conduct of the parties, but it also stated as follows:
When a course of dealing and the terms of the contract appear to conflict, the parties' practice and the written agreement must be construed as consistent with each other, if it is reasonable to do so. If no reasonable consistent construction can be drawn, however, the express terms of the agreement control.
Cox, 732 So.2d at 1096 [citations omitted]. We find this authority unpersuasive for two reasons.
First, the Cox opinion cites two cases to support this statement of the law: Flagship National Bank v. Gray Distribution Systems, Inc., 485 So.2d 1336 (Fla. 3rd DCA 1986); and Indian Harbor Citrus, Inc. v. Poppell, 658 So.2d 605 (Fla. 4th DCA 1995). The Flagship case did, in fact, state this to be the law and applied it in a case in which the maker of a note insisted that the bank was obligated to loan it additional money because the bank had done so in the past. The court cited and relied upon a rule of interpretation found in the Uniform Commercial Code, Section 671.205(4) which provides:
The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.
Subsection 1 of this Section, however, defines "course of dealing" as:
[A] sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding *531 for interpreting their expressions and other conduct.
[emphasis added].
This provision is meant as an aid for interpretation of contracts by considering the conduct between the parties before the contract was entered, not after. The court in Indian Harbor, in contrast, properly applied this rule of interpretation, holding that a prior course of dealings between the parties and the custom in the industry could not be used to interpret the contract contrary to its clear, unambiguous language.
It is respectfully submitted that the Flagship and Cox courts misapplied this rule of interpretation by suggesting that a written contract cannot be modified by the subsequent course of conduct of the parties, if the modification is contrary to the express terms of the written contract. Indeed, it has been held that a contract can be so modified even where the written contract specifically prohibits amendment or modification unless it is in writing and signed by the parties. See White, 778 So.2d at 412 (Fla. 3rd DCA 2001); Beach Higher, 717 So.2d at 563; Linear Corp. v. Standard Hardware Co., 423 So.2d 966 (Fla. 1st DCA 1983); Pan American Eng'g Co. v. Poncho's Constr. Co., 387 So.2d 1052 (Fla. 5th DCA 1980).
Even if Cox correctly stated the law, it would not apply in this case. Here, there is no direct conflict between the express terms of the contract and the subsequent conduct of the parties. The two can be reasonably construed as consistent with each other (as Cox suggests they must). The agreement in this case required the partners to make certain Class B capital contributions. It also contemplated that if the general partner asked for additional funds, any partner could, but was not required to, make a loan to the partnership. The agreement is silent as to whether the partners could make additional capital contributions. It does not provide that the only method by which a partner might make additional cash contributions to the partnership is by loan. Therefore, an agreement by the parties by way of their words and actions, to treat additional funds as capital contributions, does not directly conflict with the written terms of the agreement. The trial judge was thus justified in finding such an agreement based upon the evidence before her. Accordingly, we find no error in the trial court's ruling on this point.
REQUIREMENT THAT APPELLANT'S SHARE OF PARTNERSHIP PROCEEDS BE PAID INTO THE COURT REGISTRY PENDING THE FILING AND RESOLUTION OF THE SUIT ON THE NOTE
The promissory note became due and payable if and when Class B capital contributions under the partnership agreement were paid in full. Accrued interest was to be paid when and if the maker received any distributions of interest on Class B capital contributions. As of the date of the final hearing on February 14, 2005, the note had not matured and there was no pending lawsuit to enforce it. Counsel for the appellees acknowledged this but, nevertheless, requested that the court grant injunctive relief by requiring the partnership distributions due to appellant be placed in the court registry until such time as the appellees could avail themselves of their legal remedies to enforce the note. The trial court's granting of this temporary injunction, which was aimed at securing the collectibility of a future judgment, was error. See Int'l Village Assn., Inc. v. Schaaffee, 786 So.2d 656, 658 (Fla. 4th DCA 2001); Mary Dee's, Inc. v. Tartamella, 492 So.2d 815, 816 (Fla. 4th DCA 1986); Acquafredda v. Messina, 408 So.2d 828, 829 (Fla. 5th DCA 1982); Action Electric & Repair, Inc. v. Batelli, 416 So.2d 888, 889 (Fla. 4th DCA 1982).
*532 The appellees rely upon Georgia Banking Co. v. GMC Lending & Mortgage Services Corp., 923 So.2d 1224, 1225 (Fla. 3rd DCA 2006) and Riverland and Indian Sun L.C. v. L.J. Melody & Co., 879 So.2d 1271, 1272 (Fla. 3rd DCA 2004). In each of these cases, however, there was a specific, identifiable fund, beneficially owned by another. That is not the case here. The parties could have bargained for and included in the agreement, or the note, language that would have done so. The parties could have included language that required that the interest or principal, or both, be paid prior to any distribution of partnership funds to the maker. They did not. Rather, they simply provided that the note became due and payable upon such distribution. The holders of the note would then be free to pursue their legal remedies to collect on the note if it was not paid. The trial court did not have the authority to assist them in this by holding up distribution to the appellant.
CALCULATION OF THE INTEREST ACCRUED ON REIMBURSED EXPENSES OWED BY RHODES TO THE PARTNERSHIP
The appellees aptly confess error on this point. Under the parties' agreement, the interest owed on the reimbursed expenses was $165,277.00, rather than the $178,351.47 the trial court awarded.
We, therefore, reverse and remand with directions to the trial court to enter an amended final order consistent with this opinion.
Affirmed in part, Reversed in part, and Remanded.
GUNTHER and SHAHOOD, JJ., concur.